ALICE B. MANNEX et al., appellants,

*v.*

MICHAEL REGAN et al., respondents.

[Decided September 23d, 1921.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Griffin, who filed the following opinion:

"The bill in this cause was filed to set aside alleged fraudulent conveyances. The complainants allege that 'on the 16th day of October, 1911, and on the 5th day of March, 1913, and on the 6th day of March, 1913, and continuously thereafter until November 3d, 1913, Michael Regan, one of the defendants herein, was indebted to the complainants for goods sold and delivered in the sum of $2,854.36, with interest from October 6th, 1911;' that suit was instituted in the Hudson circuit court, and on November 3d, 1913, judgment was entered in favor of the complainants and against the defendants for damages and costs, $3,247.30. The bill then alleges the issuance of execution and the return unsatisfied, &c.

"The question whether the conveyances are fraudulent depends upon whether Hugh Murtagh, Ethel Regan, the daughter of the defendant, and Mrs. Regan, his wife, advanced the moneys, in July, 1910, to pay off the mortgage covering the premises in question given to one Adams. It appears that the defendants Michael Regan and wife gave a mortgage to James Adams, dated May 9th, 1895, and registered the same day in the Hudson county register's office for the sum of $2,000. In 1910, James Adams, being dead, his administrator, Martin Adams, threatened to foreclose the mortgage, and Mr. Regan being without funds and incapable of transacting business by reason of illness and other causes, his wife undertook to save the property. She applied to the New Jersey Title Guarantee and Trust Company for a loan of $2,000, there being then due on the mortgage that sum and about two years' interest; and on January 27th, 1910, Regan and wife executed a mortgage to the title company for $2,000, which was recorded on the same day. No money was paid by the title company and the loan fell through, because Martin Adams asserted a claim that there was $2,000, with interest, from the date of the mortgage, due and owing, namely, that there was fifteen years' interest due at six per cent., amounting to $1,800, making the total sum due of $3,800. In this situation Mrs. Regan borrowed about $1,700 from Hugh Murtagh, her cousin, one of the defendants, something under $300 from her daughter Ethel, and the balance she made up herself, amounting to $2,180, which was the sum which she conceded to

be due and owing. These moneys she delivered to Charles D. Thompson, Esquire, a counselor-at-law of this state, to pay Adams the amount due on the mortgage and to make a tender. This Mr. Thompson did. The administrator refused the tender, and then accepted the money, giving a receipt therefor; but refused to deliver up the mortgage for cancellation. Afterwards a foreclosure suit was begun, in which a counter-claim was filed. The court, finding the contention of the defendants to be correct, dismissed the bill, and under the counter-claim directed that the mortgage be delivered up for cancellation. This decree was entered after the commencement of this suit.

"Thus, it is quite plain that the moneys of Hugh Murtagh and Ethel and Mrs. Regan were used to discharge this mortgage; and these moneys were advanced prior to the 16th day of October, 1911, when the bill alleges the complainant's indebtedness commenced.

"About March 5th, 1913, Hugh was about to leave for the west and expressed a desire for security for his money, and on March 5th, 1913, Michael Regan and wife conveyed the premises in question to him by deed bearing date on that day and recorded March 7th, 1913. On the date of this conveyance there was due for principal and interest on this advance of $2,180 upwards of $2,500, a sum in excess of the apparent value of the property.

"On March 6th, 1913, Hugh conveyed the premises to Margaret Regan, wife of Michael, which deed was retained in the possession of Mr. Thompson until the 11th day of July, 1918, when it was recorded, and on July 10th, 1918, said Margaret, with Michael joining, conveyed to their daughter Ethel, by deed · dated July 10th, 1918, recorded July 11th, 1918. On July 11th, 1918, Ethel made a lease of the premises to one Albert H. Hopper, which was duly recorded. Thereafter complainants filed their bill.

"Mrs. Regan was unaware of any indebtedness to Thomas F. Mannex in his lifetime until about July, 1913, about four months after the above deeds were given. During that month some representative of Mr. Mannex called to see her husband about the claim and spoke to her concerning it, and said they would have to sue. Neither Ethel nor Murtagh knew anything of the in-

debtedness, and I think Murtagh did not learn of it, only in a general way a long time afterwards.

"Murtagh was a nephew of Mrs. Regan, a young man in receipt of a large salary, and rather careless in money matters. He was very fond of Mrs. Regan and gave her money whenever she desired it, even since he advanced the $1,700. The uncertainty in his testimony as to when and how he advanced these moneys cannot be attributed to an attempt to deceive, and cannot be taken in any such sense, because the plain fact is that there was $2,180 placed in the hands of Mr. Thompson to cancel this mortgage, and it was used for the purpose, and this money came principally from Ethel, the present owner, and Hugh. The fact that the deed from Hugh to Mrs. Regan was not recorded, I think, is reasonably clear: Hugh was going west; the deed was left with Mr. Thompson and placed in his safe, to be delivered to Mrs. Regan upon her paying the balance due to Hugh. But it is quite plain that this was not done with any fraudulent intent, because at the time of the execution of the deed neither Hugh, Mrs. Regan nor Ethel had any knowledge whatsoever of the existence of the indebtedness to Mr. Mannex; and the conveyance to Mr. Murtagh was considered at that time as absolute.

"The evidence shows that about July, 1918, Hugh was paid the balance of his $1,700, which last payment consisted of about the sum of $300, which was advanced by Ethel. Ethel was a school teacher for a number of years, and had turned in practically all of her earnings to her mother, with gifts of money made to her by her aunt and uncle; and these moneys constituted the greater part of that which was used to pay Hugh. Shortly prior to July, 1918, in a discussion between Hugh and Mrs. Regan, Hugh suggested the idea that she deed the property to Ethel, and this was done.

"During the course of the trial it was suggested to counsel that possibly these deeds should be treated as mortgages, and counsel for the defendants was willing to so treat them. As Ethel succeeds to the rights of Hugh and her mother, her claim under the mortgage would be $2,180, with interest at six per cent., from July 8th, 1910, together with the sums which she paid for taxes and other expenses necessarily incurred in the up-

13

keep of the premises, from which should be deducted the rents or other income of the property from the date of the deed to her. I also find that the defence of the Adams foreclosure suit resulted in a saving of upwards of $1,800, and that counsel for the Regans are reasonably entitled to receive from either Hugh or Ethel $500, which should be allowed them as an addition to their mortgage, because they were compelled to defend, and this defence inured to the benefit not only of Hugh and Ethel but also of the complainants, if there is sufficient in the lands to pay them after paying the sum found due on the deeds, treating them as mortgages.

"In the foreclosure suit, the advisory master, on the equities of the case, decreed that the parties should pay their own costs, and thus the expense of the litigation was cast upon Hugh and Ethel. The account, as made up by the parties, stands as follows:

| | |
|---|---|
| Amount due Ethel............................ | $2,180.00 |
| Interest from April 8th, 1910................. | 1,320.80 |
| Taxes ............................................. | 683.36 |
| Legal expenses .............................. | 500.00 |
| Total ....................................... | $4,684.16 |
| Deduct rent received by Ethel................ | 690.00 |
| Leaving a balance due to Ethel of............. | $3,994.16 |

"Turning to the value of the property: A witness for the complainants estimates the value of the property at $3,500; but taking his own figures and methods of calculation, the value is not $2,400. He says that inside lots are worth $1,400 and corner lots are worth from twenty-five to thirty per cent. more. The premises in question do not consist of two lots, but of a lot thirty-one and eighteen one hundredths on West Side avenue by one hundred feet deep. Therefore, assuming that the twenty-five feet by one hundred feet on the corner is worth thirty per cent. more than an inside lot [an inside lot being worth $1,400], and the thirty per cent. being $520, makes the value of the corner lot $1,920. The value of the additional six feet, based on the value of the inside lots, would be a little more than one-fourth, or, say, $380, which, added to the $1,920, would make the value

of the lot about $2,300. The value testified to by the defendants' expert is $2,500. And these values were the same in 1913, when the deed was made to Murtagh.· Upon this situation being ascertained, and finding that, even without allowing the counsel fee, the amount due to the defendant Ethel would largely exceed any possible value of the property, it was suggested to the counsel of the complainants that he might elect to sell the property at his own expense, and if the sum bid did not equal the amount due to Ethel, that the sale be not confirmed, and his bill dismissed; or that his bill be now dismissed; and, if presently dismissed, in view of the fact that he was justified in bringing the suit by reason of the state of the record, that no costs would be allowed against him.

"The defendant Ethel consented that another option be given to the complainants, namely, that if they so desired she would convey the property to them on payment of the amount due to her.

"A decree will be advised in accordance with the foregoing views."

*Mr. Frank G. Turner,* for the appellants.

*Mr. David F. Edwards,* for the respondents.

Per Curiam.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Griffin.

*For affirmance*—The Chief-Justice, Swayze, Trenchard, Bergen, Minturn, Kalisch, Black, Katzenbach, Heppenheimer, Williams, Van Buskirk—11.

*For reversal*—None.

*For modification*—Parker—1.